UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.:19-10190-CIV-MORENO

STEPHEN BUZZELL, JR., et al.,

      Plaintiffs,

vs.

FLORIDA KEYS AMBULANCE
SERVICE, INC. and
EDWARD BONILLA,

      Defendants
_____/

**MOTION TO RECONSIDER AND VACATE ORDER
DISMISSING PLAINTIFFS' ACTION AND FOR A NEW TRIAL
WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiffs, STEPHEN BUZZELL JR., and others similarly situated, by and through

their undersigned attorneys, move the court, pursuant to Fed. R. Civ. P. 59 and the court's

inherent authority, for an order reconsidering and vacating the order dismissing this action

and granting a new trial on the Plaintiffs' claims. The grounds for this motion are stated in

the incorporated memorandum of law below. This motion is based on the records and

proceedings in this matter, including the transcript of trial held, attached hereto as Exhibit

"A," on August 22, 2022.

**MEMORANDUM OF LAW**

This case is a collective action brought pursuant to 29 U.S.C. § 216(b) to vindicate

violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207. The case proceeded to

trial on August 22, 2022. After a jury was selected, the court admitted eighteen (18) joint

exhibits. Plaintiffs' counsel then called lead plaintiff Stephen Buzzell, Jr. as Plaintiffs' first

witness. Judge King immediately began to challenge the plaintiffs' presentation of evidence:

> Q. All right. And can you tell the jury what was the typical workday like for you?
> THE COURT: Could you establish if he had an agreement to be employed, if he had a contract -- oral or written -- and what his duties were under the contract; not his general opinion of what he did.
> You see, you've got to show materiality to this case and ask him when he was employed, the days, what he was hired to do, and then he can get into what he did. But unless it's material to this case, I can't let it be -- even though there is no objection, I can't. We've got to show materiality.
> So let's show that he had an agreement, a contract, either oral or in writing, please, and when, please. You know, lay the predicate. Go ahead.

(Tr. 70-71)

When the defense objected to a question about the locations of the defendants'

stations, this exchange occurred:

> MR. REGUEIRO: Objection. Foundation. How would he know that they have multiple locations? He hasn't testified to going there.
> THE COURT: Yes, the objection would be hearsay, I presume. We actually don't know. We had him -- in your first answer, we don't have a predicate that -- about his employment.
> For example, he said usually he got there at 8:00 o'clock, and then he told us all of the things he did. I know because I've heard you argue these things before that he would work shifts and he didn't tell us about that.
> So he starts at 8:00. Did he work 24 hours a day or not? What was his agreement? What did he agree to do? What was the contract or agreement? He's just launching into things that he did, but he's got to show the predicate first.
> Now, your objection was how does he know where the stations were, and I don't know. But that would call for hearsay because he hasn't had a predicate about that. I mean, he hasn't told us anything about his contract.
> Did someone tell you where the stations were that the ambulance service ran from, the various stations?
> THE WITNESS: Yes, sir, I knew the coverage area.
> THE COURT: Wait just a minute. What you knew and all that, it's where you learned it. Who told you that?
> THE WITNESS: Mr. Bonilla.
> THE COURT: Mister?
> THE WITNESS: Mr. Bonilla.
> THE COURT: When did he tell you where the stations were? What time? Was it the first time you interviewed with him?

THE WITNESS: Yes.

THE COURT: And that was back you told us June of 2014?

THE WITNESS: That's correct.

THE COURT: What else did he tell you would be your duties at that time? Not what you did later on and all of that. What was your agreement with him; his agreement with you?

THE WITNESS: That we would be -- that I would be doing either 24-hour shifts, 12-hour shifts. It all depended on what we gave the availability to.

THE COURT: Wait just a minute. I was to do 24-hour shifts, 12-hour shifts. It all depended on what we gave the availability to -- end.

Well, which was it? When you took the job, did you hire on to do 24-hour shifts or 12-hour shifts? Or what was it that you're hired to do that he told you and you agreed to do? The jury wants to know what your agreement was.

THE WITNESS: There wasn't any set agreement, Judge. It was -- it was discussed that: You could work a 24-hour shift, you could work a 12-hour shift, you could work an 8-hour shift. It was whatever we gave availability of what we could do when we were called and asked what our schedule would be for the next couple weeks.

THE COURT: But you just told us two minutes ago, three minutes ago, that you signed something. What did you sign?

THE WITNESS: I stated that I believe I signed something.

THE COURT: All right. You said you believed you did. Fair enough.

Do you have a copy of what you signed? Or does the lawyer have one he can hand him and let him identify?

MR. GALLUP: No, Your Honor, I don't.

THE COURT: All right. Let me ask the witness. So it was all that you hired on to do, was what was told to you by him and what you said you'd be willing to do or agreed to do.

Did you talk about the money you would be paid? Your payment?

THE WITNESS: Yes, it was discussed as what we would get paid per day to be on call, and then what it would be per -- the amount of money was decided by the mileage.

THE COURT: Now, what did he tell you?

THE WITNESS: That's what he told me, Judge.

THE COURT: Listen, when I'm talking, you get to shut up. Okay? When I'm speaking to you, asking you a question or anything, everybody gets to be quiet until I finish. Don't interrupt. Don't interrupt. Don't interrupt your lawyer.

All right. You told us about shifts. He didn't say anything to you about what you'd be paid on each per hour shift or per day shift; did he? Or did he? Did he tell you what money you would be paid if you worked a 12-hour shift?

THE WITNESS: It was -- it was discussed that if we worked -- if we were available for usually it was for 24 hours, it would be a hundred dollars for the day; if it was for 12 hours, it would be 50 dollars for the day.

And then the rest of it was dependent on how far you transported the patient.

THE COURT: Very good. That wasn't hard to do. Now we know what the parties talked about.

3

> Please try to limit what was said to him, what he said to them, or what he saw and knew; not what he thought. Do you understand? We're talking about facts. All right.
> Mr. Gallup, go ahead. We have an idea of what he was hired to do. Now, go ahead.

(Tr. 72-76)

Mr. Buzzell then gave some basic testimony about his job duties as an on-call paramedic, the location of his residence, and the distance and travel time between his residence and the station to which he reported when he received a call from his employer. (Tr. 76-79) He testified about the time it takes to travel from the station to area hospitals. (Tr. 82-83) He testified about the procedure he followed when he received a call. (Tr. 83-85) He testified that company policy required him to arrive at the hospital within thirty (30) minutes of the call and described the restrictions that the policy imposed upon his ability to leave his home when he was on call. (Tr. 85-86) As he began to describe off-duty activities that he could not perform while on-call, the court intervened despite the absence of an objection:

> THE COURT: Excuse me. Just one minute.
> When you were off duty, you mean when you were not on a shift, like a 12-hour shift or a 24-hour shift?
> THE WITNESS: That's correct.
> THE COURT: So you were on your regular time off. Do we care what he did during his time off? Is that relevant or material to anything?
> MR. GALLUP: Yes, Your Honor.
> THE COURT: You had the right to be wherever you wanted to be when you were not on your 12-hour shift, hypothetically, or 24 hours, the answer is yes.
> And you're asking him where he went. That's not material to anything.

(Tr. 87-88)

When plaintiff's counsel again asked about activities the plaintiff performed while off duty that he was unable to perform on duty, the court gave this ruling to a relevance objection:

> THE COURT: That again is a hypothetical question not based on any facts in this record at this point. That went back to his original agreement with the company, and he's told us about that.

4

He worked on shifts, 12-hour or 24-hour. And telling him where he couldn't --
there was nothing -- Was there anything in your original agreement that prohibited
you from you and your wife doing whatever you normally did in your normal living
when you were not on shifts?
  THE WITNESS: No, sir.
  THE COURT: So asking him what he did is a total waste of all our time.
  MR. GALLUP: Maybe I misspoke. Let me try to be clear.
  BY MR. GALLUP:
  Q. While you were on duty --
  THE COURT: On a shift.
  BY MR. GALLUP:
  Q. -- on a shift, were there places that you could not go and things that you
could not do because if you did them, you would be too far away from the station?
  A. Yes.
  THE COURT: The objection is sustained, because it calls for a hypothetical
conclusion about his normal life, unless he establishes first it was told to him by the
person or had a contract about that. The objection is sustained.

(Tr. 88-89)

Counsel asked Mr. Buzzell whether the Defendant told him how far from the station
he could go when he was on call. Mr. Buzzell answered no and attempted to explain his
understanding of how the requirement to arrive at a hospital within thirty (30) minutes of
receiving a call affected his ability to perform personal activities. The judge interrupted and
again took over the questioning while offering his own interpretation of answers he expected
the plaintiff to give:

  THE COURT: Now, just a minute. You're not objecting to this, but he's now
telling us what he figured he could do or couldn't do.
  He was asked, part of your employment agreement with the ambulance
service, were you told how far you could go away from the station in order to be
responsive? He answered no. That ends it. He could do whatever he wanted to do at
that point. You can argue that.
  You see, he wasn't -- he wasn't told what he could do and couldn't do, and he
said that Mr. Bonilla never told him how far he could go away. If he could drive to
Jacksonville and had a supersonic jet and answered the call in the time frame, then
what difference did it make where he was?
  Pardon me, but material questions. We need what was the contract, what one
person said to the other person, what they agreed to. And that question is a
hypothetical one, which we don't know ever came up, and hypotheticals are not
proper questions unless they're based on the record.

5

Let me put it this way. Sir, Mr. -- I'm awfully sorry. I had trouble, Mr. Stephen --

THE WITNESS: Buzzell.

THE COURT: Mr. Buzzell, when you were on, let's say, a 12-hour shift, tell me the time frame that it was -- I know it was like 12:00 to 12:00, but tell me what was the 12-hour shift? It could be? Just tell me what it was.

THE WITNESS: Usually a 12-hour shift was either 0800 to 2000 or 2000 to 0800.

THE COURT: Good. All right. That wasn't too hard. Now, when, let's say, that you agreed -- and you would agree or would know that on a 12-hour shift you would report or be available to pick up that phone at 0800 hours, 8:00 o'clock in the morning or 9:00 or 10:00, anytime in the 12-hour period; am I correct on that?

THE WITNESS: That's correct.

THE COURT: All right. And you know that generally or from what was told to you that from certain -- from the stations, the three stations there would be a period of time which you were expected to do your best to get the person to go to the station, pick up the ambulance, have it ready to go, get the person that had called to the station who called you, and do it within either 15 minutes or 20 or 30.

And if it was going to take longer, you told your employer -- see, none of this is in the record -- but am I correct that the person who called you was calling you from the defendant red ambulance service? Am I correct?

THE WITNESS: Yes, sir.

THE COURT: They didn't call Miss Jones because they didn't know who to call. They would call the red ambulance service, the ambulance service would call you, and you were expected to be there to pick up the phone and take the call; correct?

THE WITNESS: Yes, sir.

THE COURT: During that 12-hour period. We're only talking 12 and 24. And you were the general -- the general kind of rule was that you had 15 minutes, or maybe longer, to get your clothes on, your boots on, your hair combed, and get to the station, and then get that ambulance ready and then pick Mr. or Miss Jones up, who had called the station, who had called you, and get there in 15 minutes to 30 minutes. I'm just liberalizing a bit. And if you couldn't, you'd call the station back and say: Hey, there was no gas in the truck when I got there and I had to fill it up, or whatever, and there's traffic. Yeah, there's always traffic or not or little or more in the Keys. Going down there as a Keys judge for over 50 years, and I know most of the people, everybody who's been a juror in my juries, so Keys traffic is -- so you call your employer, red ambulance, and say: Hey, there's a jam-up on the Seven Mile Bridge, and I may be an hour, or whatever. But you do that, and they knew and they would keep track.

And, by the way, weren't you getting paid for your per diem mileage also as part of your employment?

THE WITNESS: I was being paid a flat rate for the whole day for being available, and then only for the actual mileage in the truck.

THE COURT: But part of your contract was something to do with mileage, in addition to your $50 an hour or your hundred dollars -- pardon me, $50 a day? A trip? Or what?

THE WITNESS: $100, Judge.

THE COURT: A 12-hour shift, how much did you get paid if you went and answered one of these calls and did all those things? It may have taken you a couple hours or whatever it took, but you got for the 12-hour shift, as you've testified, you got the 12-hour shift a hundred dollars a day; and for the 24-hour shift $50 a day. You testified to that.

THE WITNESS: It was $100 for a 24-hour shift, and it was $50 for a 12-hour shift for the per diem.

THE COURT: All right. And so in addition to that, there was some flat rate for mileage that also got computed. Don't worry. That's not the big thing. All right. So when you were wherever you were, if you were at home and got the call and responded, or if you had driven to the --

What the thrust of his question is: Were you permitted to leave your home, go to the grocery store, go see a movie, sleep, you were entitled to do all of these things, except being available for that phone when it rang in that 12-hour period; am I correct?

THE WITNESS: You're correct in a sense, Judge, that we could do anything that we wanted to and while we were on call, as long as we responded to the hospital within 30 minutes.

THE COURT: That's an excellent answer. Now, he knew the answer, it's in the record, and it tells. And you can argue to the jury: You could sleep. We don't have to go through all of the things he does, you know, when he had a birthday, when he kissed his wife good night. Come on, we don't need to do all of that.

You can do whatever you wished to do, as long as you met those criteria which you've told us about, and that's what he got paid. Now, when you're asking him -- well, that's why a question about: Well, did you figure out and all this? Whether he figured it out or not, if he did, fine; if he didn't, fine.

The records will show the time that the employer gave him credit for, and he will tell us time where he was right there and did that and didn't get paid for that.

But going through the times he took a shower is kind of counterproductive. You see what I'm getting at, these things, please. Now, go ahead with your questions.

MR. GALLUP: Thank you, Your Honor. I will.

THE COURT: I'm sorry I've had to interrupt you, but I want to make clear. And he's made clear that he was free to do whatever he wanted to do. He had to be careful and conscientious.

Did you do your best to do that, and were you conscientious and tried to be there so that if you went to the grocery store or if you took a nap and a call came, as long as you answered it, you were doing your job? So you could sleep, but did you do your best to be confident each time that you did this? Did you do that?

THE WITNESS: Yes, sir. That was what was expected of us.

THE COURT: The time he: Well, most of the time I was sleeping -- it's not material. It's not. He was permitted to do that. Go ahead, please.

MR. GALLUP: Thank you, Your Honor.

THE COURT: And I will try not to interrupt you anymore.

(Tr. 89-95)

The judge's attempt "not to interrupt... anymore" was soon followed by this exchange:

Q. Well, Mr. Buzzell, given the fact that you had to get to the hospital within a half hour when you were on-call, were there things that you were not free to do while you were on call in order to comply with that half hour requirement?

THE COURT: Is there an objection about materiality?

MR. REGUEIRO: Yes, Your Honor. Objection. Materiality.

THE COURT: Sustained.

(Tr. 95)

Q. Sure. During your shift was there any period of time that you were told: You're completely relieved of any responsibility to respond to a call, so you can turn off your phone and sleep soundly?

THE COURT: Was that told to you by your employer when he hired you?

THE WITNESS: No, sir.

THE COURT: I'm sorry, what did you say?

THE WITNESS: No, sir.

THE COURT: So it's not material. There is no materiality to what he could do; it's what he was supposed to do. Go ahead. Next question.

(Tr. 96)

Q. And were you -- were there calls that would come in in the middle of the night?

THE COURT: Now, wait a minute. You're asking him about a call. You've got to show the time, the place, and what happened, if it's material to something that he was doing that he wasn't supposed to do. The objection is sustained.

MR. GALLUP: There was no objection, Your Honor.

THE COURT: Well, I know there isn't. I think both lawyers -- all lawyers ought to pay attention to what we're doing here. What we're doing here is trying to find out if he didn't work during a shift for which the employer had the right to not pay him for the shift. That's not -- none of that is shown. We're getting into what he was doing, unless it was told to him that he was free to do it when he wasn't on a 12-hour shift.

If you're getting into a time that he took a vacation for three weeks and didn't have a shift, that's got no bearing because that wasn't part of his job. He was entitled to do that, if they told him he could do that, if they gave him the time off.

MR. GALLUP: Your Honor --

THE COURT: I don't know how I can make this any clearer.

8

MR. GALLUP: Your Honor, would it be possible to have sidebar so we could, perhaps, clear this up and make the trial go more efficiently for the jury?

THE COURT: Well, I think the jury understands.

MR. GALLUP: I would request --

THE COURT: Did you ever have a conversation with Mr. -- the defendant --

THE WITNESS: Mr. Bonilla.

THE COURT: See, you cut me off. He cut you off. He doesn't know the end of the sentence.

THE WITNESS: I didn't respond, Judge.

THE COURT: Just keep your mouth shut.

THE WITNESS: It wasn't me, sir; it was him.

THE COURT: Listen to the question. Did Mr. Bonilla or the red ambulance company ever tell you anything about what you could do when you weren't on shift, except what you've already testified about; which is you answer the call and go? Is there anything else that you could do? I know they told you you were entitled to get permission to not be on shift. But if you're on the shift, did you have anything else you could do that would take you off that shift? Did you then call and say: I want a 12-hour shift from 8:00 A.M. to what would be 8:00 P.M. at night and this is 3:00 o'clock in the afternoon, and I want to take my children to the playground, and I won't be answering the phone call, I won't be on the shift; and they would say: Fine. That's okay? Did they ever tell you, you could do things like that?

THE WITNESS: No.

THE COURT: All right. They want to talk to me sidebar. If you would step into the jury room, please. I think the jury could answer my question by now; they've heard it so much.

(Tr. 96-99)

The judge began the sidebar by asking defense counsel why they were not objecting to more questions. (Tr. 99-101) When he was allowed to speak, Plaintiffs' counsel noted that the issue was whether the plaintiffs were engaged to work or waiting to be engaged when they were on-call. Counsel explained that the degree of freedom the plaintiffs had during their on-call shifts was critical to that determination. The judge disagreed:

THE COURT: Only if he did it, and only if you lay the predicate that on July 22nd of three years ago I didn't serve and here is the time, the place, and I phoned them and I told them and they told me that it was okay to take two hours off and we put that down, that's materiality. That's when it happened; when it happened. That's what proof is all about; not guesswork.

Well, there were times when I developed a pain in my side, and I said I've got to go to my doctor and I'm going to be gone for three hours on Tuesday or something of my 12 hours, something there. Because you can't just say: Well, there

were times when I was sleeping and I decided that I wanted two hours off to make
love to my wife.

       That's a terrible example because it's kindly, it's meant sweetly. I'm sure there
were times -- anyway. She's a lovely lady, I'm sure, and you're a nice man and you're
nice people.

       But just this vague thing that you would decide as long as you figured you
could take whatever time off to not answer that phone, not pick it up, I won't pick up
the phone, and you would figure it out that you could go up to -- you could take from
your home and you could drive up to Miami and would be gone for two hours and
not answer and you couldn't get back in time, that's leaving it all up to his thinking
about what time it took, how long it took, whether there was traffic, all these
extraneous things that have nothing to do with this case unless he actually called and
unless he was told he could do that.

(Tr. 101-02)

    After noting that the plaintiff did not testify that he was engaged to wait, the judge

asked whether the FLSA mandates that employers and employees "should agree on engaged

to wait in their contract?" Plaintiffs' counsel responded that whether an employee is engaged

to wait is determined by the facts: an employee whose personal freedom is so restricted during

on-call time that the employee cannot do what he wants to do has been engaged to wait.

Counsel explained that he was trying to elicit evidence of the activities in which the plaintiff

would ordinarily engage that his all-call hours prevented him from performing. (Tr. 102-03)

The court responded:

       THE COURT: This is all in his mind about whether he could do the job or
not, so he had the choice not to accept the job, but he has to tell what the job was.

       And this business that you're getting into about when he can make up his
mind anytime he wanted to, to figure out the time from his house to the station,
wherever it was, or the time from whatever he wanted to do, and he could just
engage whenever he wanted to and not tell them would be a breach of the contract
with them because they didn't agree to that with him.

       Now, maybe there will be other witnesses to say that they had an agreement
with him where they told him: You can engage to wait. So if you want to make love
-- let me get a better example.

       If you want to -- you've got the right to be at home, you've got the right to
sleep, you've got the right to go to the movies, if you want to, as long as you keep
that phone, and you've got the right to go to the grocery store, you've got the right to
take your car in, all these things.

10

But you don't -- but unless he's given the right to adjust in his own mind whether he can engage to wait for four hours because he knows that the traffic is going to be bad on the Seven Mile Bridge and it's going to take longer and not call them and tell them all that, if he's going to do that, that's immaterial to this case, because it's not part of his contract.

So it's a nice theory that you've got of letting him sit around and saying: Well, back four years ago, one afternoon I was setting around and I thought, well, the grocery store, they haven't got it here, it's only ten minutes from my home, and I can drive to Key West and get avocado pears and they're not in season.

And I know that the traffic there and back is going to be this, and I know that it's going to take time, or I'm going to get it on my way to Key West. That is totally immaterial to this case. I have so ruled, and that's the way it is.

(Tr. 103-04)

Plaintiffs' counsel then explained the materiality of the proffered testimony: "The question in this case is: While he was on call, did he have a sufficient amount of personal freedom and time to do what he wanted to do such that he should not be paid overtime for those hours? So it's not a matter of whether, you know, he could do something." (Tr. 104) The court again ruled that proof the plaintiffs were engaged to wait should come from evidence that "engaged to wait" was part of the employment contract. (Tr. 105-06) After discussing his experience with traffic in the Keyes, the judge repeated that "there is no predicate about engaged to wait in this record." (Tr. 106-07) When Plaintiffs' counsel attempted to clarify his argument, the judge told him "No, you're finished your argument. I've ruled and that's the end of it. It's not going to be admitted into evidence in this record." (Tr. 107) The judge then instructed defense counsel to object to questions that did not ask about an agreement between the plaintiffs and defendants. (Tr. 107)

After further discussion along the same lines, the judge described another district court judge's ruling in an FLSA case as "such a wrong interpretation of the law, that it can't be any -- I would rule it was totally wrong." (Tr. 111) The court then instructed plaintiffs' counsel not to call additional witnesses to testify about any facts beyond the employment agreements

made by the parties. (Tr. 111-12) The judge told the plaintiff that if he didn't like his employment agreement, he should have made a different one. (Tr. 117)

Plaintiffs' counsel attempted to make an offer of proof regarding his remaining testimony. Counsel began with questions about the exhibits. The judge commented that the defense was "crazy enough to agree to all" the admitted exhibits. (Tr. 118) After a lengthy discussion about whether exhibits that had ***already been admitted*** were admissible and what the exhibits would prove, the judge said: "I'm trying to teach you how to present your case, but it's not working. You just don't understand the rules of evidence." (Tr. 125)

Without considering any other exhibits, the judge asked the defense about its theory of the case. (Tr. 126) The judge then asked about payment for mileages after being told it wasn't part of the case. (Tr. 131-35) When the judge asked about whether the plaintiffs received their $50 or $100 shift payments, plaintiffs counsel advised the court that the plaintiffs were not making a claim for nonpayment of those amounts. The court responded:

> THE COURT: You're not making a claim for that. The only thing you're making a claim for is some made-up theory that he is going to try to remember from four years every time he didn't get paid a fair overtime for the overtime, which included the mileage, and you haven't got that evidence from what you're telling me from this big book.
> . . .
>
> THE COURT: My point being: Where do you get that theory? Where does this cockamamie theory come up? It's in the law, but the law has to be proven with facts. Where in the facts of this case?

(Tr. 135-40) The court then made this ruling:

> I am ruling that he was paid every dime he was supposed to be paid under the contract as it has been testified by the plaintiff in this case of $50 per time and a hundred dollars other times.
> And, therefore, the case will be dismissed, and you can take on appeal if you want to go up or he can take it on appeal to decide whether I should have ruled at the trial.
> . . .

I thought I could listen to this. What I found at the trial was a perfectly competent, honest, honorable plaintiff, who gave us -- answered the questions about what he got paid, which was the $50 or the hundred dollars a day and he got that. What he is talking about is this other theory.

So you can take your appeal on that. God bless you. The case is dismissed. I'm ruling on it as it stands now.

(Tr. 141)

THE COURT: Make my ruling as I just said it, which is -- let me do it this way.

I'm dictating this. And, Clem, you will get it from the court reporter.

On the issue of whether or not he is an employee or a private individual contractor, I'm not ruling on.

But on the basis that he was paid under the contract that he had with the defendant, where he was to get $100 per day for every 12-hour shift and $50 per day for every 24-hour shift -- I wrote it down wrong. Strike that. I am ruling that on the issue of independent contractor or employee, that the agreement that the evidence shows clearly and there's no other evidence forthcoming to the contrary, was that on the 12-hour shift, every time he worked a 12-hour shift, and it was written up in the books and records and that Exhibit 1 over there, he was to get $100 per shift for the 24-hour shift, regardless of the number of calls he had to go make; and that on the 12-hour shift, he was to get $50 per day for each 12-hour shift.

And that the contract between the parties was that whatever he did on his time shift, as long as he met the requirements of answering the phone calls -- that is, sleep, go to movies, do anything -- that as long as he was there available, he was complying and he was due his money, and there's no evidence that he wasn't paid his full shift for that.

(Tr. 142) The court later added:

Now, on the other thing about which he was, I decline to rule, and you can take that up on the appeal and say: The Court should have ruled on that, and they may send it back on some kind of cockamamie theory that both of you have some way along the line that he was one or the other. But there is no evidence in this record -- make a note of this -- no evidence in this record that he was not fully paid the $50 a day when due or the 24-hour a day when due; and that there is evidence that he wasn't given a per diem mileage rate. But there is no evidence that he was due to be paid more money than the 50 and $100, no matter how many trips he took in a given day. And there is no evidence during the days, proof in this record, of any times about how many he took or how many he didn't take, except what is written up in the big book 1, and that that would only show at the most as a benefit to the plaintiff of the per diem for mileage. And I find there is no evidence of that, so there's no damages for that, no damages proven thus far, and therefore the complaint is dismissed with prejudice, the class action with prejudice.

. . .

And I will draw an order and you will get an order. The time for appeal is from the date of my order, which will not be until later. I will go dictate it tomorrow.

(Tr.143-44)

## Argument

### I.    A Motion for New Trial is Authorized by Fed. R. Civ. P. 59

Judge King entered an Order for Dismissal on August 24, 2022. (Doc. 96) The Order is not styled as a Final Order. That Order is a nullity. Prior to its entry, the case was transferred to Judge Moreno "for all further proceedings." (Doc. 95) Since entry of the dismissal order was a further proceeding, Judge King had no authority to enter it, nor has a final judgment been entered.[1] To clarify that the Order is a nullity, this motion requests that the court vacate the Order.

Neither the parties nor this court have treated the Order for Dismissal as a final order. The parties stipulated to the dismissal of a contract claim that the Order did not expressly address, notwithstanding that the Order purports to have dismissed the entire case. (Doc. 102) This court also entered a briefing schedule permitting the parties to file motions. (Doc. 101) That action signals the court's intent that the August 24, 2022 order is not a final order, if it has any legal significance at all. Since no final order has been entered and no appeal has been taken, this court retains jurisdiction over this action.[2]

---

[1] As Judge King purported to terminate the trial by denying all relief, a judgment was required. Fed. R. Civ. P. 58(b)(1)(C). A judgment must be entered as a separate document. Fed. R. Civ. P. 58(a). No separate judgment was entered.

[2] An appeal may deprive the district court of jurisdiction as to issues encompassed in the appeal. *Mahone v. Ray*, 326 F.3d 1176 (11th Cir. 2003). Since no appeal has been taken and no final, appealable judgment has been entered, the court retains jurisdiction to hear this motion.

The Federal Rules of Civil Procedure authorize a motion for a new trial after a jury trial concludes "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). While Rule 59(b) provides that the motion may not be filed more than 28 days after judgment has been entered, the rule does not preclude the filing of a motion for a new trial before judgment has been entered. *First State Bank v. City and County Bank*, 872 F.2d 707, 708 n.2 (6th Cir. 1989) (citing 11 C. Wright A. Miller, Federal Practice and Procedure: Civil § 2812, at 82 (1973) for the proposition that Rule 59(b) "sets a maximum and there is nothing to prevent making a motion for a new trial before judgment has been entered"). The court is accordingly authorized to hear this motion.

## II.   A New Trial Should Be Ordered Because the District Court Unreasonably Interfered with the Presentation of the Plaintiffs' Case

While courts have the authority to question witnesses, that authority is abused when the court "abandons its proper role and assumes the role of an advocate." *Sec. & Exch. Comm'n v. Levin,* 849 F.3d 995, 1007 (11th Cir. 2017). *See also Ferguson v. Bombardier Services Corp.,* 244 F. App'x 944, 12 (11th Cir. 2007) (quoting advisory committee notes to Fed. R. Evid. 614). The court acted as an advocate for the defense theory, or perhaps for the court's own theory, by extensively questioning the only witness, expounding at great length on the court's view of the law in and outside of the jury's presence, and preventing the plaintiffs from finishing the named plaintiff's testimony or from calling other witnesses.

The court belittled counsel by repeatedly suggesting that counsel did not understand the rules of evidence or know how to try the case. The court signaled its bias by repeatedly thwarting counsel's attempt to ask relevant questions about its theory of the case. A dismissal entered under those circumstances cannot stand. *See United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) ("Outright bias or belittling of counsel is ordinarily reversible error.")

The judge's "improper questioning seriously affected the fairness . . . of [the plaintiffs' trial." <u>Levin</u>, 849 F.3d 995, 1007 (11th Cir. 2017). Virtually all of the questioning of plaintiffs' witness was conducted by the court, not counsel. The questioning reveals that the court "stray[ed] from neutrality." *United States v. Lankford*, 196 F.3d 563, 573 (5th Cir. 1999). The court cut off counsel's attempt to elicit relevant evidence in order to pursue its own theory: that the plaintiffs received their shift pay and were not entitled to overtime because their employment agreement did not tell them not to pursuing their own activities. As the next ground of this motion argues, that theory misstates both the law and the theory of plaintiffs' case. Because the court did not give the plaintiffs a fair opportunity to present their case, the court's conclusion that no evidence would support a verdict in the plaintiffs' favor deprived the plaintiffs of a fair trial.

## III.   A New Trial Should Be Ordered Because the Dismissal Was Erroneous as a Matter of Law

Judge King did not state that he was directing a verdict, but a dismissal at the close of evidence is in essence a directed verdict.[3] Judge King declined to hear all the evidence, but apparently decided based on the evidence *he* elicited that no reasonable jury could find in the plaintiffs' favor. That conclusion was incorrect as a matter of law.

Employees are entitled to overtime when their "hours worked" exceed 40 in a workweek. 29 U.S.C. § 207. The FLSA requires employers to count on-call hours as "hours

---

[3] A directed verdict is proper only if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). Before granting a directed verdict, a court "should consider all of the evidence — not just that evidence which supports the non-mover's case — but in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Id.* By ending the trial before the first witness even finished testifying, the court plainly failed to consider "all the evidence." It thus erred in directing a verdict against the plaintiffs.

worked" when an employee must remain so close to the employer's premises "that he cannot use the time effectively for his own purposes." 29 C.F.R. § 785.17.

The plaintiffs' theory of the case was detailed in summary judgment motions. They intended to prove that they could not effectively use their on-call time for their own purposes because the time it takes to arrive at a hospital within thirty (30) minutes of receiving a call makes it impossible to engage in any activity that cannot be performed within a few minutes of the station to which they were assigned. (Doc. 67: ¶¶ 19-68)

While Judge King focused on whether the employment agreement established that the plaintiffs were engaged to wait, case law makes clear that whether on-call time counts as "hours worked" under the FLSA "depends on the degree to which the employee may use the time for personal activities." *Birdwell v. City of Gadsen*, 970 F.2d 802, 807 (11th Cir. 1992) (*citing Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944)). "Whether on-call or waiting time is working time that is compensable under § 207(a)(1) is a question of fact dependent on all the circumstances of the case." *Paniagua v. City of Galveston, Texas*, 995 F.2d 1310, 1316 (5th Cir. 1993). The relevant facts are those that establish whether "the employee can use the time effectively for his or her own purposes." *Halferty v. Pulse Drug Co.*, 864 F.2d 1185 (5th Cir. 1989) (citing 29 C.F.R. §§ 785.16-17). *See also* U.S. Dept. of Labor WHD Opinion Letter, FLSA2009-17 (Jan. 16, 2009) ("[W]hether employees must be compensated for the time they are on call is a question of fact that depends upon whether the conditions are so restrictive or the calls are so frequent that the employees cannot effectively use the time for personal purposes.").The inquiry therefore depends on evidence establishing the degree to which the employee's time to engage in personal activities is limited, not on whether an employment agreement expressly prohibited an employee from engaging in personal activities.

Plaintiff Buzzell attempted to prove how his ability to engage in personal activities was limited by contrasting what he could do during off-call hours with what he could do during on-call shifts when he was not responding to a call. The court did not regard that testimony as "material" because the defendants did not expressly limit the activities in which Buzzell could engage while on-call. The defendants did, however, require Buzzell to remain sufficiently close to the station during on-call hours to permit a trip to the hospital to be completed within thirty (30) minutes. That job requirement substantially limited Buzzell's ability to use his time effectively for his own purposes — a fact the court did not allow Buzzell to prove.[4]

The record the plaintiffs intended to make (as their summary judgment submissions made clear) would have established that they had very limited ability to engage in personal activities while they were on-call. Buzzell could not go out of town, go boating, go to the movies, attend any appointments, or engage in any other personal activities that he could not leave at a moment's notice. (Doc. 67: ¶ 67) Plaintiffs who resided at the station during on-call hours could not go to their homes or spend time with their families, go to the movies, tend to doctor's appointments or other personal needs, or otherwise partake in any personal endeavors that would take them more than two or three minutes from the station to which they were assigned. (Doc. 67: ¶ 68) Calls were so frequent that the plaintiffs often could not sleep during a 24-hour shift. (Doc. 67: ¶¶ 63-65) All of that evidence, if believed by the jury, would have satisfied the legal standard that the plaintiffs could not use their time effectively for their own purposes while on call, yet the judge declared all evidence of the

_____

[4] The court devoted substantial time to discussing traffic in the Keys and how it might affect Buzzell's ability to respond. The plaintiffs never suggested that traffic conditions were relevant to their claims.

18

plaintiffs' ability to engage in personal activities to be immaterial because the employment agreement did not expressly prohibit the plaintiffs from engaging in those activities. The judge's analysis was wrong as a matter of law.

Indeed, Plaintiffs were precluded from presenting any additional witnesses beyond Mr. Buzzell. Had they been able to do so, Plaintiffs intended to elicit testimony to show that there were times in which the plaintiffs were ordered to drive their vehicle to a bridge midway between Marathon and Tavernier, and wait there in case a call came in. During those times, plaintiffs will testify they often waited for hours without the ability to do anything outside of the vehicle. In fact, the plaintiffs would have testified that there were no restaurants or food available on the bridge nor was there even a restroom.

"Rule 59 of the Federal Rules of Civil Procedure confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612 (5th Cir. 1985). A new trial may be granted if "the trial was unfair, or prejudicial error was committed in its course." *Id*. at 613. The trial was unfair because the court declined to submit the legal issue to the jury. A court's substitution of its own view of the evidence for a view that a jury might reasonably adopt is "an impermissible practice." *Tortu v. Las Vegas Metro*, 556 F.3d 1075, 1084 (9th Cir. 2009). Plaintiffs who are not allowed to present relevant evidence have plainly been denied a fair trial.

Moreover, a court's incorrect legal analysis is an error that is correctable with a new trial. The court's decision amounted to a directed verdict in the defendants' favor. Errors of law in granting a directed verdict can be remedied with a new trial. *See Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1543-44 (11th Cir. 1994) (granting new trial because directed verdict was based on error of law). To the extent that the district court's decision could be viewed as

an exercise of discretion, discretion is abused when the court "employs an erroneous legal standard." *Barnes v. City of Cincinnati*, 401 F.3d 729, 741 (6th Cir. 2005). The court clearly erred by focusing its inquiry on the terms of the employment agreement rather than the impact of the defendants' on-call policy on the plaintiffs' ability to engage in personal activities. A dismissal based on a blatant error of law cannot stand.

While Rule 59(a)(1) applies to jury trials, no jury verdict was returned because the court took it upon itself to decide the case on its merits. This case might alternatively be viewed as a nonjury trial since the case was taken from the jury and decided by the court. "After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2). The plaintiffs request that the court "take additional testimony" at a new trial and leave the resolution of the case to the jury, as this case was always meant to be a jury trial.

## IV.   The Court Should Reconsider Its Decision

To the extent that the court declines to grant relief on the basis of the rules cited above, the court should nevertheless reconsider Judge King's decision. "It is within the Court's discretion to grant a motion for reconsideration." *Peeler v. KVH Indus., Inc.,* No. 8:12-cv-1584-T-33TGW, at *4 (M.D. Fla. Sep. 19, 2013). "An order on a motion to dismiss is an interlocutory order, and may therefore be reconsidered at any time before entry of final judgment." *H.A.L. v. Foltz,* No. 3:05-cv-873-J-33MMH, at *2 (M.D. Fla. Mar. 7, 2007).

A motion to reconsider may be granted to correct clear error or a manifest injustice. Peeler, No. 8:12-cv-1584-T-33TGW, at *4. As the arguments above demonstrate, the trial court committed clear error by injecting itself into the trial and deciding the case on an

erroneous view of the law. The court's actions caused a manifest injustice by depriving the plaintiffs of a jury's consideration of their evidence — evidence that the court erroneously refused to allow the plaintiffs to present. For all the reasons discussed above, the court should reconsider and vacate the order of dismissal and set this matter for a trial by jury.

<u>Conclusion</u>

For the reasons stated, the plaintiffs request that the court vacate the order dismissing their action and order a new trial before a jury.

Respectfully submitted,

*/s/ Dana M. Gallup*
Dana M. Gallup, Esq.
Fla. Bar No. 0949329
E-Mail: dgallup@gallup-law.com
Jacob K. Auerbach, Esq.
Fla. Bar No. 84003
E-Mail: jauerbach@gallup-law.com
**GALLUP AUERBACH**
4000 Hollywood Boulevard
Presidential Circle-Suite 265 South
Hollywood, FL 33021
Telephone: (954) 894-3035
Facsimile: (754) 200-2836
*Co-counsel for Plaintiffs*

Robert S. Norell, Esq.
Fla. Bar No. 996777
E-Mail: rob@floridawagelaw.com
**ROBERT S. NORELL, P.A.**
300 N.W. 70th Avenue
Suite 305
Plantation, FL 33317
Telephone: (954) 617-6017
*Co-counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on September 30, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                By:    ***/s/ Dana M. Gallup***
                         Dana M. Gallup, Esq.

**Service List**
CASE NO.: 19-CV-10190-MORENO

Dana M. Gallup, Esq.
E-Mail: dgallup@gallup-law.com
Jacob Auerbach, Esq.
E-Mail: jauerbach@gallup-law.com
**GALLUP AUERBACH**
4000 Hollywood Boulevard
Presidential Circle – Suite 265 South
Hollywood, FL 33021
Telephone: (954) 894-3035
Facsimile: (954) 894-8015
*Co-counsel for Plaintiffs*

Robert S. Norell, Esq.
E-Mail: rob@floridawagelaw.com
**ROBERT S. NORELL, P.A.**
300 N.W. 70th Avenue
Suite 305
Plantation, FL 33317
Telephone: (954) 617-6017
Facsimile: (954) 617-6018
*Co-counsel for Plaintiffs*
Method of Service: CM/ECF

Theron Simmons, Esq.
E-Mail: tsimmons@law-bsa.com
**BRIDGES, SIMMONS & ASSOCIATES**
101 NE 3rd Avenue
Suite 1500
Fort Lauderdale, FL 33301
Telephone: (954) 332-3706
*Co-counsel for Defendants*
Method of Service: CM/ECF

Rainier Regueiro, Esq.
E-Mail: rainier.regueiro@gallardolawyers.com
**GALLARDO LAW FIRM, P.A.**
8492 SW 8th St.
Miami, FL 33144
Office: (305) 261-7000
Co-counsel for Defendants
Method of Service: CM/ECF